Maya Noella Bayan v. Kalolo Kijakazi, case number 20-16884, submitted on the briefs, will be submitted as of this date. The next case on calendar is Leonard Kata Frometa v. Merrick Garland, 20-72699, that's submitted on the briefs, will be submitted as of this date. The next case on for argument is United States of America v. Mickey Roy Anderson, case number 19-10213. Each side has 15 minutes in this matter. We're ready. Thank you. Thank you. May I please the court? My name is Dori Zavala. I'm counsel for the defendant, Mickey Roy Anderson, Sr. With the court's permission, I would like to reserve three minutes of my time for rebuttal. As a preliminary matter, I would also like to withdraw my argument in section C of my opening brief regarding the life sentence mandatory minimum and le floor. I've reviewed the government's response and after additional research, I know the court's time is valuable and I would prefer not to pursue that particular argument. All right. Thank you. Thank you. Now here, the question of whether a murder was premeditated in the first degree hinges exclusively on whether there's enough circumstantial evidence for a finding of premeditation. Here, there was not. The government appealed to the biases of the jury to get the conviction for first degree murder. Our criminal justice system relies on a central tenet that the government bears the burden of proof to establish the defendant's guilt beyond a reasonable doubt, including the degree of the offense charged. This is important because it ensures a presumption of innocence and it protects against unjust convictions. I mean, why do you think that no rational juror could have found, no rational jury could have found premeditation here given the events? Your Honor, I believe that the events actually didn't meet the traditional hallmark of premeditation. There was no evidence that Mr. Anderson planned Ms. Murdoch's killing. There was no evidence that he had any motive to kill Ms. Murdoch. There was no evidence of prior altercation. I think you're dealing with hyperbole here when you say there's no evidence because you have to, if an inference can be made from something and there were things that he said that were negative, that people were going to die, he was very agitated about people. Let's see. Well, among other things, he didn't like Ms. Murdoch buying her meth from a rival drug dealer, right? Chino sent him into rage and we had several things discussed there. And it's, I think you're pushing a hard rock uphill to say there's no evidence of that. Well, Your Honor, actually, and I don't contest that he did say that some people would die. Notably, that was never Ms. Murdoch. And what we're talking about here is whether he premeditated her murder. If we said that everybody who got angry before a murder- Okay, but you have to look at, you can't take everything, you can't take everyone isolated. So what discussion was there about Chino before and him being upset about other people buying drugs from Chino? Before he shot Auntie in the face, what did he learn that she had bought drugs from Chino? Didn't she hold some up and say, taunt him? She never said that those drugs were from Chino, actually. When they arrived at her house and she let them in, she was excited that she scored, but there was nothing in the testimony that ever said that she got those drugs from Chino. Did anyone say anything about her buying drugs from Chino? Earlier on in the car, there was some reference to him being upset about Chino, and we completely, I concede that, that he was very upset. This was his nemesis, apparently. He was very upset about Chino. At one point in the car, one of the witnesses said that he got angry thinking that she was texting with Chino. And she said, no, I'm not, and did mention that the victim had been texting with Chino. And I believe one of the witnesses also said that the victim may have been buying drugs from Chino. Okay, so there was evidence before he shot her in the face about him being very upset with Chino, that the victim may have bought drugs from Chino, was having contact with Chino. I mean, he was just flying off the handle over that and saying that someone's going to die. And so it's hard, it's just hard to see how there's no evidence that he didn't premeditate. And I know, I think you take some exception with the statement about it was, it can only, it just only has to be seconds or whatever. But that being said. Well, Your Honor, and again, we don't contest that he was upset with Chino, but that's not the victim in this case. Chino was not the victim in this case. The only thing that could have suggested that he was premeditating the murder of this particular victim would have been when he was upset in the car on the way over. He habitually carried a gun with him. The other witnesses when they were in the house said that he sat down when he got in the house. I think what you're confusing is you're saying there's no evidence. He didn't have a good reason to shoot Auntie, but you're a criminal lawyer. I've done criminal law for a lot of my career. A lot of people don't have good reasons for killing someone, but no evidence is not the same as not having a good reason for killing someone. And that's what I see your argument amounting to. Well, and Your Honor, in second degree murder, a lot of people don't have a good reason either. That's not what we're talking about is whether he had a good reason to shoot her or not. I don't think that's the question here. The question is whether he actually with a cool and deliberate mind premeditated and planned to kill her. And that is what I'm saying is that the cumulative effect of the evidence, which is all we can go on here, the court said. Well, is there anything in the record that would show that the gun accidentally went off when he shot her point blank in the face? Your Honor, that's separate. That's intent. We're not arguing that he didn't intend to shoot her. But the case was very clear that intent and premeditation are two different things. So in second degree murder, he could have intended to shoot her as well. In fact, malice of forethought is one of the elements of second degree murder. The only distinction in first degree, and I'm not arguing that it was not second degree murder, or I'm only arguing that the premeditation element of first degree murder was not met here. Isn't it sort of against your position that there's nothing in the record showing an altercation between your client and auntie before the shooting? So it's not as if it were, oh, spur of the moment, oh, because they were yelling and screaming at each other. There's nothing in the record about that. She was just happy she had her drugs and he just lifts his gun up and blasts her, right? Right. And I'm not saying that he had a good reason to do any of that. I'm saying that he didn't plan to do it ahead of time, that the evidence isn't indicating that he went in there with a plan to murder her. The references to killing someone was not references to killing her, and that had been a day or two before. In the car, he didn't mention killing anyone. He never mentioned hurting her. They had never had any fights. He went into the house, did not have his gun drawn. He sat down and then impulsively decided to shoot her. So that's the question. It's not about intent. It's whether it was premeditated with a cool mind, as is required. Could a jury draw an inference, again, of premeditation just from the fact that he had this gun with him and he was brandishing it? He had stolen it a few days before, right? And then there's evidence that he was all excited about the gun and waving it around in the car. And then he goes in the house with the gun. Maybe somebody could infer reasonably that there was premeditation, that she was one of the three he had in mind who he thought ought to be killed. Well, unfortunately, Your Honor, that's just complete speculation on the part of the jury, which is what Neville specifically says is not permitted. That shouldn't even go to the jury if it's asking for speculation. This isn't- Well, you can call speculation or you can call it connecting the dots and natural inferences. So I think what you have to say is that it's speculation and not connecting the dots. And if it's just as likely that it's connecting to the dots, that goes back to Judge Bress's question. Are you saying no rational juror can conclude this, much less 12? Absolutely. Actually, that is what I'm saying. I'm saying that there was not enough dots to connect that this should have been presented to the jury for this particular victim. Again, we're not arguing that there were definitely statements made against Chino. And if we were in the court today and Chino had been the murder victim, this would be a very different argument. But Chino was not the murder victim. Ms. Murdoch was. Right, but she was associated with him. I mean, she was not a random person in all of this. She was someone that he knew was connected to her and to Chino's drug dealing. Well, he knew her for many other things. He frequently got together with her. He had been her house many times, so he knew her. The only thing that connects her with Chino is this one statement that was made in the car. But again, everybody who commits second degree murder as well is likely angry at the victim before they commit second degree murder. So just the fact that he was angry with her does not mean that it was premeditated first degree murder. This was more consistent with something that was impulsive. He went in the house. He sat down. The witnesses said they themselves were shocked. They didn't see this coming. This was a spur of the moment thing that he did. And he did it. There's nothing to evidence that he had a cold mind and that he was, I'm sorry, a cool mind and that he deliberately planned this out. And here the jury had a lot of reasons to be biased. And that's one of the problems. And that's one of the reasons that the government has the burden of proving beyond a reasonable doubt these elements before it goes to the jury to avoid against jury bias. This is a case that was involving murder on a tribal land where there was testimony. The defendant was a known drug dealer. As you can see from the record, he made comments that were very shocking. It'd be very easy for the jury to just assume that this is a bad guy and someone who probably planned to murder not just the victim, but lots of people. And that's exactly how the government painted him as an aggrieved drug dealer. He stole a gun. He planned to get rid of multiple people. Are you claiming that there's some evidence that came in that shouldn't have, that wasn't part of the briefing? Yeah. No. Yeah. The briefing is basically that this was based on speculation that the government did not present enough evidence to meet their burden of proof as to the element of premeditation. That the element of premeditation, the judge should have granted the motion because the government did not present enough evidence of premeditation for first degree murder. That the jury, it was mere speculation based on the evidence that was presented. Well, what about, I want to kind of sort of go back just because that now it's not enough evidence. First it was no evidence, but now if I, as you're, it it's, I'm sort of seeing more shortly before all of this, then he talks about, he wants to kill three people, even though we don't know that auntie's one of him, one of them, but then he is a drug dealer. He's enraged at Chino. He's having difficulties with people in the car, thinks that they're texting Chino. He learns that his auntie has no, she's the one that's texted Chino and bought drugs from him. Then they go into the place. He doesn't do it immediately, but then he says, auntie, come over here in, you know, and so he thought enough and he came over and shoots her flat out in the face and she drops. And then after they leave everyone else, they can count to three and they heard that previously. So they leave them at a gas station because they figure they could be two and three or whatever. So it's sort of like the more that you talk about it, the more that I see more evidence. Well, and your honor, there is evidence of premeditation against Chino. As I said, I don't believe there's sufficient evidence as premeditation against this particular, but you could look at it the other way. There's premeditation against three people and you don't know the identity of all three of them. And auntie turns out to be one of the three. So, and if I could go back there, I mean, I think I actually would argue that there may not even be premeditation against any of those three people. There was a comment that he made. It doesn't show that there was a plan. He didn't do anything to go after them. You have two minutes. Do you want to save that for rebuttal? Yeah. If I can just say one more thing and I'll take it out of my time. Is that in this case, he didn't even ask to go over to the victim's house. It was another individual in the car that suggested they go over to the house. So there's just not the suggestion or enough evidence, sufficient evidence to show that there was an actual plan here for for premeditated murder. Thank you. Okay. We'll hear from the government. Good morning, your honors. Can you see me and hear me? Okay. Yes. Excellent. May it please the court. My name is Alexander Samuels. I'm an assistant U.S. attorney here in Phoenix, and I'm here on behalf of the United States. But like Mrs. Vala, I'd like to start by addressing the premeditation issue and note that this is far from the first case in which this court has had to confront the question of what constitutes sufficient evidence of premeditation in a first example, this court articulated a standard and observed that whether a defendant acted with premeditation is a factual question for the jury to decide. And that any such jury verdict should not be disturbed lightly. That conclusion flows logically from Jackson, from Nevels, and from all the cases that articulate the sufficiency of the evidence standard that this court has to apply here. And looking at that standard, looking at the evidence in the light most favorable to the government and resolving all inferences in favor of supporting the jury's verdict, there is ample evidence of premeditation in this case. And with that, let me turn a little bit to the evidence. And before I talk about the evidence on the day of the murder, which was January 23rd of 2014, I want to talk a little bit about what happened the day before the murder, because I think the jury heard a lot of evidence about that. And it really sets the stage for evaluating what happened on the 23rd. The day before the murder that afternoon and early evening, Mr. Anderson was at the victim's home, not with the victim present, but with another individual present, Ms. Barley. While he was at the home, Ms. Barley testified that Chino arrived at the home and that with Chino was Mr. Anderson's sister, Belinda. Ms. Barley testified that when that happened, immediately upon that happening, Mr. Anderson became extremely agitated, became extremely upset, was upset that his sister was with Chino, was asking out loud why his sister would be with Chino, was just upset that Chino was there in general. As a result of Chino and Belinda arriving, the defendant not only was saying those things, but as Your Honor alluded to earlier, talked about how he was going to get rid of three people, how one of those people was Chino. And Ms. Barley testified that he didn't just say that one time, he kept saying it. Now, that was the afternoon and early evening of the Is the implication that's being drawn here that because Chino went to Murdoch's house, Mr. Anderson was sort of recognizing the connection between the two of them? Is that the inference you asked the jury to draw from the day before? I think there's several inferences that the jury could draw from Chino arriving the day before. I think one of the most important pieces of this is the evidence about Mr. Anderson's own statements during this interaction or lack of interaction. But I do also think there are several other pieces of this that fit into the jury's ultimate conclusion that this was premeditated. There was conversation earlier, for example, about whether Mr. Anderson would have thought or known that the drugs that the victim had on the night of the murder came from Chino. Well, there were several facts which would have supported Mr. Anderson thinking that. For one, one of those facts is that Chino was at the That's exactly what I'm asking. That's right. Yeah. Yeah. And so I do think I do think by his being there the day before that helped support the inference that that Mr. Anderson had a motive in relation to thinking that this victim was communicating with Chino, had some relationship with Chino, and perhaps or was buying methamphetamine from Chino. The jury ultimately could have concluded that from a number of other factors, including Mr. Anderson's own statements the next day. But I do think this is a relevant fact in that analysis. Turning back, assuming I've answered your question, Your Honor, I want to turn back to the morning of the 22nd, because the testimony at trial supported any conclusion that, you know, there's been discussion here that Mr. Anderson habitually carried a firearm. That is not what the evidence showed at trial. What the evidence showed at trial was that Mr. Anderson stole the murder weapon and another handgun the day before the murder. And in the unlikely event that it wasn't the day before the murder, at the earliest, it was two days before the murder. That is a combination of testimony and Facebook messages, which were dated, that showed when an individual procured that handgun and then testimony about when Mr. Anderson would have taken it. So in terms of him habitually carrying the firearm, to the extent there was any habit, it was only a day or two old. And I think the jury, again, could have drawn inferences from the recent procuring of that firearm and another firearm. Now, the day before these couple of events the day before really add context to what happened on the day of the murder. On the day of the murder, there was significant testimony about a lot of items that would have given Mr. Anderson a motive to kill Ms. Murdoch. There was testimony that they were in a vehicle, that Mr. Anderson was in a vehicle with three other individuals, and that there was a conversation, apparently a significant conversation, in which Anderson and someone else were accusing someone of communicating with Chino. We're talking about how no one should be communicating with Chino. And in that conversation, a witness told Mr. Anderson that the victim was communicating with Chino and directly told Mr. Anderson the victim was buying methamphetamine from Chino. That witness testified that directly upon saying that, Mr. Anderson became upset that this was driving towards the victim's home, and that he started saying, let's go, let's go, let's go in a raised voice while holding the murder weapon. When they arrived at the home, he was the first one out of the vehicle. He was the first one to the door. These witnesses testified that he became agitated when the victim did not answer the door right away. And one witness said he acted as if he thought that the victim was hiding something from him. The victim answered the door with methamphetamine in her hand that Mr. Anderson would have known did not come from him and must have come from some other drug dealer. And Mr. Anderson then walked in and did not commit this crime in a matter of a second or two. After walking in, he sat down with the murder weapon on the couch for some moment. And then after that, stood up, walked across the room, and then took the time to call out to the victim and say, yo, auntie. And then after doing that, waited for the victim to look up at him and see what was about to happen. And only then did he pull the trigger and shoot her from point blank range. All of these things support the jury's conclusion that there was premeditation in this case. Frankly, even if many of them had been absent, I think under the forgiving standards of Jackson and Nevels, that there could have been sufficient evidence in this but that's not the case here. The case here is that all of those things were present, that the context from the previous day was present, and looking at all of that as a whole, as the jury did, and as this court must, I think that's well more than sufficient evidence under the standards that this court must apply. I understood the counsel for the appellant withdrew one of her arguments. Is that what you understood? Or can you, if there's something that did you want to say anything on that? So do we just have the sufficiency of the evidence before us? Or what's your understanding? I want to make sure I'm clear on that. Yes, thank you. My understanding is that she did withdraw the argument about the proper penalty for first degree murder under section 1111. I do think that leaves a couple of other issues that are in many ways related to the premeditation issue. One was that there was a prosecutorial misconduct claim in the opening brief, but that misconduct claim is very much about what the standard is for premeditation. If the court has questions about that, I'm happy to talk about it. There's also one other issue, which is whether there was sufficient evidence of burglary, which again presents some overlapping issues with whether Mr. Anderson premeditated the crime or what his intent was when he walked into the home. But the burglary question is frankly, I believe even less close because the burglary statute allows for a number of possibilities. Does the Major Crimes Act and the Assimilated Crimes Act allow the federal prosecution of a state statute that defines burglary far broader than the traditional concept of taking property? I think it does, Your Honor. That's what she was attacking. Am I correct? So I don't think the argument was made here that the state statute shouldn't or couldn't be assimilated, although I think it could and I'm happy to talk about that. I think the argument here was as framed in the opening brief, just a sufficiency of the evidence argument. And it's important to note that evaluating that sufficiency claim, this court has previously in Bonat back in 1997 looked at this burglary statute and has explicitly in that opinion that in evaluating that statute, it must look to the Arizona case law and it must treat the Arizona court's interpretation of that statute as if it was the statutory language itself. And so to Your Honor's point, it is undoubtedly the case and certainly undisputed here that the burglary statute in Arizona is broader than common law burglary. However, this court has routinely evaluated Arizona burglary cases. And so for example, in Reza Ramos, it was an interesting situation where it presented a felony murder count and a burglary count arising from Arizona. And the court distinguished the two there and said for felony murder, it looks like what Congress would have intended was to incorporate common law burglary. But when we're looking at the Major Crimes Act, Congress specifically said to use the state law in the jurisdiction where the crime happened. And Congress would have known, and certainly that state statutes differ. And so I think it's understandable to think that Congress's to allow for the assimilation of some different statutes. But again, I don't think that's quite the argument here. I think the argument here is just about whether there was sufficient evidence of burglary. It is odd that it could be burglary anytime there's a felony committed inside someone else's dwelling when no property is taken. Frankly, Your Honor, I agree with you. It is odd and they have acknowledged for years that their definition of burglary is broader than the common law definition. And perhaps on the broader side even of statutory burglary definitions that go beyond common law burglary. But the Arizona courts have been abundantly clear that it is that broad. And they have even in certain cases acknowledged. So in Gordon, for example, one of the Arizona cases cited in the briefs, they acknowledge that there are situations where you can't commit the other crime without also committing a burglary. The crime there was a sexual assault that occurred in a home. And the court said in evaluating a sentencing issue, yes, it's probably the case that the sexual assault as it was committed could not have possibly been committed without also committing a burglary. That may seem strange. It does seem strange. But that is the state of the law in Arizona. And Bonat tells us that that has to be the state of the law as this court evaluates the sufficiency claim here. It just seems mistitled, if anything. I mean, it's felonious conduct within a home not limited to taking something from the house. Well, I do think it's certainly the case here that the statute is broader than what we might think of as burglary and certainly what common law burglary is. I mean, it doesn't strike me as mistitled in the sense that perhaps this might present a different case if there was statute that was called burglary and was just completely about something else. This does resemble burglary in many ways. It just goes further. And so even if the defense had made the argument here that the statute was not properly assimilated, I don't think that argument would be correct. I think in California, you can commit a burglary if you just you're entering to commit like entering to commit a rape or entering to commit other felonies. So it's not crime. That's exactly correct, Judge. And actually, it's an interesting point because really the first case on point in Arizona about this subject is a case called McCreary. It's from the 1920s. It was, I think, about a decade after Arizona became a state. And in that case, they articulated most of the standards that frankly still apply. And in that case, they point to California law and they point to California courts interpretations of the similar standard. And I think that's remained the case in the nearly 100 years since. You know, just a question. If the burglary count were kicked out, would that affect the first murder count in any way or the sentence in any way? It wouldn't, Your Honor. I think it would. In this particular case, I don't think it would affect Mr. Anderson on a practical level in the sense that I don't think it would affect his sentence in any way. Off the top of my head, the only the only way I could articulate that it would affect him is that there would be one less $100 special assessment, I think, given the fact that he had a mandatory life sentence imposed on the first degree murder count. I think assuming the first degree murder count was affirmed, that it wouldn't necessarily affect him on a very practical level. Although there's certainly case law from this court that says, you know, there's collateral consequences that flow from virtually any conviction. And so this court, I think, looks at that issue pretty broadly. All right. Thank you. Thank you, Your Honor. If there's no other questions, thank you very much for the time. There do not appear to be other questions. Okay, we'll go back to the appellant and you have Thank you, Your Honor. I would, in the brief time I have left, just ask the court to look at the dissent in Begay that we've cited in our case. It's an en banc Ninth Circuit case. I completely understand that it is a dissent, but I think it's interesting in talking about the importance of the distinction between first and second degree murder and why that's important. Are you citing to the dissent or I'm not, I didn't quite understand. Yes, I am. I'm referring to the dissent and three judges there. Again, not, I know this is not binding authority, but there's some discussion there, Dicta. It's kind of the opposite of binding authority. Exactly, exactly. But there's some important things they talk about the distinction between first and second degree murder and how it's very important that we maintain that distinction. And as it gets closer and closer together to first and second degree murder, we need to make sure that there's actually proof of premeditation, as opposed as again, to just an impulsive killing or something that's a spur of the moment. Again, the argument being here that there may have been premeditation against other victims, but not sufficient against this particular victim. And then I know I'm almost out of time. As regards to the burglary, our argument is that basically, as your honor pointed out, anybody who commits a felony in any house in Arizona can be convicted of burglary. So there's no requirement of theft or anything like that. Our argument is that that can't possibly be what the legislature intended. That's so broad as to basically say somebody could enter by invitation, which did happen in this case. But as soon as they pull a trigger or do something that intends to commit a crime, they've then committed burglary. It does bear on the sentence of this case only to the fact that Mr. Anderson did receive a consecutive 10-year sentence for the burglary count. So while he did receive a life sentence on the first degree murder, he did receive a 10-year sentence on the burglary count, consecutive. All right. Yes. Thank you. All right. Thank you both for your argument. This matter will stand.
judges: Gilman, CALLAHAN, BRESS